In 2015, the NIGC approved the Tribe's Ordinance to Engage in Class II Gaming, BINGO. The NIGC approved that request in the manner required by 2710B and 2710E of IGRA, pursuant to an express delegation of authority by Congress. As the Supreme Court observed in the City of Arlington, virtually no case has denied Chevron deference to when an agency acts pursuant to such express delegations of authority. But the State makes four contentions here. First that the NIGC improperly deemed the Restoration Act impliedly repealed. Second, that the NIGC unlawfully interpreted the Restoration Act, a statute that it does not administer. Third, that the NIGC's interpretation is not reasonable and therefore not entitled to Chevron deference. And fourth, that the NIGC's interpretation is foreclosed by a slot of one. Mr. Ashby, if the agency here, the NIGC, based its decision on the idea that the IGRA impliedly repealed the Restoration Act, if that's the case, I know you may say that it's not, but if that's the case, would you concede that under Brand X, our prior decision in the Isolato One case from 1994 would control? Your Honor, the Brand X says that unless the court makes a finding that the text of the What the Isolato One found was plain, clear, unequivocal was whether cabazon ban was incorporated into, with respect to the word prohibit in the Restoration Act. Didn't it also find that the IGRA did not impliedly repeal the Restoration Act? Correct. That is correct. So if the agency, if the NIGC found that contrary, don't we have to go with Isolato One? No, Your Honor, because the whole implied repeal analysis in Isolato One had to do with the fundamentally different remedial schemes, one related to class three gaming, whether the tribe could force the state to negotiate a tribal state compact. And with respect to the Restoration Act, the question was, can the state sue in federal court to enjoin class three gaming? And because of that conflict, the court felt, believed it had to decide which of those two laws applied. Here, for purposes of class two gaming, which is a fundamentally different issue, different analysis, the two statutes can do work in harmony. Obviously, to the extent the tribes engaged in unauthorized class two gaming or engaged in class two gaming that without an ordinance that was approved by the NIGC, the state has full authority to proceed under the Restoration Act to seek an injunction to halt that conduct. And of course, the NIGC never found that the Restoration Act was impliedly repealed by IGRA. In fact, it analyzed its jurisdiction through the lens of the Indian Gaming Regulatory Act and its text. And it specifically examined the scope of IGRA to determine whether the NIGC has jurisdiction over the tribe's Restoration Act. In order for me to understand sort of at a granular level what the agency did, I mean, I've got a letter from the agency here, the October 8, 2015 letter. Does that sort of embody the reasoning of the agency? There are two letters, Your Honor. One relates to the Isleta tribe, and then there's one for the Alabama Kashaw, which is sort of a truncated version that essentially adopts the same reasoning. But yes, that's correct. The letter that explains why these two tribes fall within the jurisdiction of the NIGC, the letter that was sent to Isleta is more detailed and lays out all of the agency's reasoning. Okay. I mean, the reason I ask is because the more truncated letter seems to sort of incorporate that finding that the Restoration Act was impliedly repealed by the IGRA. Or do you read it differently? It doesn't. Because if you look at the two letters, all they say is that the Department of Interior concurred in our analysis. And then the Department of Interior went on to find that actually the Solicitor General's Office, not the Department of Interior itself, and obviously the DOI Solicitor General's memo is not entitled to Chevron deference. But that's the only place that implied repeal even arises. The NIGC, on the other hand, is looking at this issue solely through the lens of the Restoration Act, a sufficiently specific prohibition against Class II gaming, that the tribes do not fit within the Class II safe harbor. And the NIGC found correctly, we think, that it was not. I mean, there are three types of laws, if you look at the legislative history, that would meet that requirement. One is the Johnson Act, which the Senate report for IGRA says references gaming that utilizes mechanical devices as defined in the Johnson Act and notes that this language was intended to make clear that IGRA didn't legalize certain games that were already illegal as a matter of Federal law. Then the Senate report goes on to identify the Rhode Island Claims Settlement Act and the Maine Indian Claims Settlement Act as embodying the type of specific restrictions of Federal authority about gaming that were not affected by IGRA. But unlike the Rhode Island Settlement Act, the Restoration Act does not give Texas criminal or civil regulatory jurisdiction over gaming. In fact, it expressly withholds it in the statute. And unlike the Maine statute, which requires that any future act of Congress expressly state that it implies in Maine, the Restoration Act contains no savings clause. That was intended to preserve it from the effect of future enacted laws, and IGRA did come 14 months after the Restoration Act was adopted. And in fact, the Restoration Act expressly makes the tribe eligible for the benefit of future laws, and courts have uniformly characterized IGRA as a law that was enacted for the benefit of Indian tribes. So it is entirely possible for this letter one to be correct. We don't think it is correct, but it's entirely possible for it to be correct and for the tribe permitted to engage in Class II gaming. With respect to the administration of the Restoration Act, which is the state, one of the state's principal arguments, it's important to recognize that the NIGC did not purport to administer the Restoration Act or to exercise its jurisdiction under the guise of the Restoration Act. Instead, it analyzed its jurisdiction under IGRA, the statute that it does administer. And it did so, again, pursuant to an unambiguous delegation of authority by Congress. Chevron precedent holds that the case for judicial deference is at its highest when the agency acts pursuant to Congress's expressed direction. And in this case, the NIGC had to approve or reject the tribe's Class II gaming ordinance if, depending on whether it thought the requirements of 2710b1 were satisfied. And the state's argument overlooks a number of cases where courts have deferred to agency action that entail consideration of law outside the law that the agency administers. City of Arlington held that there is no exception to the normal deferential standard of review for jurisdictional or legal questions concerning the coverage of the Act. And the Court reached that conclusion based on earlier Supreme Court cases that Chevron applies to cases in which an agency adopts a construction of a jurisdictional provision of a statute it administers that implicates other laws. And the Court gave several examples. In the city of New York, the Court unanimously concluded that the FCC did not exceed its statutory authority by preempting state laws and regulations related to cable television, despite presumptions in favor of state sovereignty. And in CFTC v. Schor, the Court gave Chevron deference to an agency's assertion of jurisdiction over federal and state law counterclaims, based solely on what the Court called an oblique reference in its administering statute. But more importantly, and I think more on point, the Supreme Court has also made clear that Chevron applies when Congress authorizes an agency to implement its statute in light of other federal law. In Holly Farms, the National Labor Relations Board interpreted the term employee in the NLRA as including poultry workers by determining that they were not agricultural laborers. In doing so, the NLRB had to interpret the term agriculture in the Fair Labor Standards Act. A statute administered not by the NLRB, but by the Department of Labor. Rejecting the plain language argument that was advanced by the petitioners, the Court held that the NLRB's interpretation of agriculture under the FLSA was reasonable and controlled under Chevron. The State obviously relies heavily on EPIC systems for a contrary conclusion, but that case doesn't modify city of Arlington. It doesn't mention city of Arlington. And also EPIC systems doesn't have any bearing on this case. The NLRB does not administer the Federal Arbitration Act, which is a transgovernmental statute for which agency interpretations routinely don't receive Chevron deference. And nothing in the NLRA directed the Board to interpret the Federal Arbitration Act. So what we had in that case was the NLRB was interpreting an unrelated statute about a different subject matter without a delegation of authority by Congress to do so. And for those reasons, the Court declined to apply Chevron deference. But in this case, Congress directed the NIGC to determine whether Federal laws specifically prohibit Class II gaming on Indian lands under 2710b1. The NIGC's analysis of the Restoration Act, which obviously is an act that touches on In addition, the district court relied heavily on America's community bankers for a contrary conclusion, but the Court didn't fully appreciate the import of that case. In America's community banker, the D.C. Circuit actually gave Chevron deference to the FDIC's interpretation of two Federal statutes, only one of which the FDIC administered. The precise question in that case was whether the FDIC properly construed its authority and obligations under Sections 1441 and Sections 1817 of Title 12. Section 1441 was administered by the Finance Corporation, and only Section 1817 was administered by the FDIC. The Court held that the FDIC, quote, settled on a permissible construction and they afforded Chevron deference on the ground that the FDIC's actions derived principally from its interpretation of a statute that it administered, even though it also interpreted another statute that was administered by a different agency. And the same reasoning applies here. The NIGC grounded its decision in Igris text, thus qualifying for review under Chevron. Finally, the Eighth Circuit's decision in Santee Sioux came to the same conclusion. The NIGC concluded that the game being played on the tribe's lands was not a prohibited Class III gaming device, but a permissible Class II gaming device. In doing so, the NIGC concluded that certain gaming aids were excluded from the Johnson Act. And although the NIGC did not administer the Johnson Act, the Court held that the NIGC had given its imprimatur to these types of machines, quote, notwithstanding the Johnson Act, and that the agency's conclusion was a reasonable interpretation of Igris. The same reasoning applies here. The NIGC's interpretation derives principally from Igris, the statute that it administers. And finally, with respect to this Letter I and whether it forecloses the NIGC's determination here, it's important to recognize that this Letter I's conclusion that Congress' intention was, again, explicit, clear, unambiguous, relates to its holding that the word prohibit in the Restoration Act did not incorporate Cabazon's prohibitory regulatory distinction. But that conclusion does not mean that the Restoration Act prohibits Class II gaming under IGRA Section 2710B. If anything, this Letter I's conclusion means just the opposite, that the Restoration Act both prohibits and regulates gaming. And where Class II gaming is only regulated, IGRA compels the conclusion that such gaming is permitted under IGRA. And in fact, this Letter I said that for purposes of determining what Class II, which tribes can engage in Class II gaming, this Letter I itself says both in text and in a footnote that the NIGC was supposed to apply the Cabazon ban prohibitory distinction in order to determine whether it is a sufficiently specific law to bar gaming. You've said that you think this Letter I is incorrect, but you've also told us that you think you can prevail even under this Letter I. Are you nonetheless asking that that case be reconsidered in bank? We are not at this time, Your Honor. We obviously raised the issue for purposes of preserving it for further appeal, but to the extent we prevail on the Chevron issue, we don't believe we would need to address that issue. All right. Thank you, Mr. Ashby. You've saved time for your comment. Mr. White. Thank you. May it please the Court. The District Court correctly concluded that binding precedent from this Court resolves the issue of whether the tribe can take advantage of IGRA's permissive gaming regime. The District Court also correctly concluded that in any event, there is no cause to defer to the National Indian Gaming Commission's decision essentially to abrogate a federal statute that Congress did not charge that agency with administering. On the first point, this Court recognized in its Letter I that being subject to Texas gaming law was the price demanded by some members of the Texas congressional delegation to authorize federal restoration of the Two Restoration Act tribes. In order to secure that benefit, those tribes willingly agreed to that condition. The tribe now claims that his Letter I doesn't control this case because this is all grounded in a specific provision in IGRA. That conflicts. That represents sort of a pivot, I think, in this case. In the opening brief on page 6, they said point blank when they were asking for this Court to take his Letter I on bank, they said that the his Letter I Court, quote, considered the same question and reached the opposite answer of the National Indian Gaming Commission. Now all of the focus is on the supposed differences between those two cases. But all of that is essentially irrelevant because it ignores that his Letter I decided a necessary antecedent issue here. And that is it doesn't matter what a particular term of IGRA says because the issue in his Letter I was whether IGRA's gaming provisions apply at all to the tribe, all of the various provisions in IGRA. And in this Court, looked to the language in IGRA and in the Restoration Act and examined the interplay between those two statutes and concluded, quote, that not only that the Restoration Act survives today, but also that it and not IGRA governs the determination of whether gaming activities proposed by the Restoration Act tribes are allowed under Texas law, which functions as surrogate Federal law. So is that — is your argument that the Restoration Act is the more specific one and that the general rule of statutory construction is that the more specific act prevails over the more general one? That was part of this Court's rationale in his Letter I. And, yes, we believe that that's correct. But we also — I mean, that's still true, isn't it? Yes, it is still true. I mean, there's some language going the opposite way from the First Circuit. I mean, we — I can argue — I can talk later about how that case is distinguishable. But the Aquinnah case comes to the other conclusion there, I guess. But this is — I mean, IGRA deals with gaming on Indian reservations. There are lots of Indian tribes. The Restoration Act deals with gaming on these specific two tribes' reservation lands. It is not necessarily uncommon to have these types of Restoration Acts, but it's not incredibly common either. Like, there are — the vast majority, I would imagine, of Indian tribes would fall clearly under IGRA's purview. But there are specific — as the NIGC even recognized here, these two tribes are, to some extent, uniquely situated because they made a deal in order to get Federal restoration. When there was some opposition to it, they made a deal to be bound by Texas gaming law. Now, if they had waited a couple years, maybe they could have struck a different deal. But this is the deal that they struck. At the — In order for — I'm sorry to interrupt. If — in order for Brandeis to sort of control in this case and allow us to avoid getting into the Chevron issue, correct me if I'm wrong. It's not enough just to state the holding of Isleta I. I mean, I think you've done that. But Brandeis says that the prior decision must hold that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. And it's your position that what we did in Isleta I follows from the unambiguous terms of the statute? Well, I think that it — yes, actually, I believe that it does. I think that the Court in Isleta I looked at the unambiguous terms of the Restoration Act and of IGRA. Now, the Court also engaged in — in looking at the legislative history and interpretive canons of construction, as it was invited to by the parties in that case. It was not a Chevron deference case. And this is why we talk about in our brief the — the Home Concrete case, where they were dealing with a similar situation, where the issue — the — maybe today, in today's environment, there would — you wouldn't have, at the party's invitation, addressed legislative history to the extent the Court did. I'm looking at — I'm looking at Isleta right here, and it's a — well, look, with all due respect to the Isleta panel, I mean, the Court says at the conclusion of — of part of its analysis, we find ourselves confronted with substantial legislative history to the contrary, including the plain language of Section 107a. So was — was the panel including the plain language of the statute as part of the legislative history? I'm just trying to imagine what this analysis was. It may not have been the clearest opinion ever written by this Court, but it does engage with the language in both of the statutes. I mean, it points to — the plain language in the Restoration Act makes quite clear that all gaming activities that are prohibited by the laws of the State of Texas are hereby prohibited on the reservation. It subjects the tribes to the same civil and criminal penalties. That's when the Court talks about the cabazon ban distinction and how that can possibly apply. It also cites — it looks at the language of IGRA. It points to the very provision that the tribe now points to as grounding this separate decision made by the NIGC. This 25 U.S.C. 2710b1a is referenced to other Federal laws. It looks to that language. So I think the Court there is — maybe it's a bit of a mishmash between applying the language of the statute and the legislative history and the kinds of interpretation, but it is — at the end of the day, it — the whole thing that we're supposed to be getting at is whether the prior Court opinion made a clear and ambiguous determination of congressional intent. And the Court there did that. I mean, it used the language that it was — it was unambiguously Congress's intent that these two particular tribes would be subject to the Restoration Act, which was not impliedly repealed by IGRA. Well, take just so in the home, whatever that case is called, where Justice Breyer is maybe the narrowest holding. What's that case called? Home concrete. Home concrete. Well, you have five justices there. Whether or not getting into this battle over whether it is the opinion of the Court or just an opinion of the plurality, I mean, you had four justices say what Justice Breyer did there. And then Justice Scalia would have gone even further. And this — Brand X wouldn't even be an issue. Is Justice Breyer trying to change the inquiry in Brand X? I mean, as I read his plurality opinion, we're supposed to look at whether the prior decision said there were any gaps left by Congress, sort of a proxy Chevron step one inquiry or something like that. I mean, is it your view that Asleta I said there's no gaps left between the Restoration Act and the IGRA for an agency to fill? Oh, yes. Yes. That is our position. Our position is, you know, you look at the language, the Court says multiple times that this is what's explicitly stated in the Act. IGRA should be considered in light of other Federal law, that its decision was unambiguous. There's that litany of words that came up just before. It was explicit, clear, unambiguous, plain, and specific. And this is not the first time this Court has had to address Brand X. I mean, the Exelon Wynn case that we talk about on page 19 of our brief from 2014 goes through a lot of these cases from other circuits that the Tribe pointed to here to say that there's a Brand X problem in this case. And what you do is, I mean, it's a bit of an art and not a science to go back and look at an opinion that was not talking about Chevron and determine whether congressional intent was clear, but you look at the language. And so we discuss on pages 18 to 21 of our brief all these out-of-circuit cases. And just to take a couple examples, there's a Dominion Energy case out of the First Circuit where, you know, you had this earlier statute that was that the Court said was opaque and that it could find no sign of a plainly discernible congressional intent. The Rush case out of the Seventh Circuit, the earlier court opinion used back-and-forth language that was unclear at best. And so it is, to some element, a degree of reading the tea leaves. And I would maintain that there are probably some cases that are close to the line. But as Leta I, whether or not it was written as clearly as it could have been, there does not seem to be any intention in the language of the opinion itself to suggest that there is a gap that an agency could later fill. Just even putting aside, though, just to move on to the second issue of this case, I mean, we would argue the easiest way for the panel to resolve this case is just to say is Leta I is binding, and that is our position. But even putting that aside, this case comes down to a private party asking for deference to an agency determination that a statute it does not administer has been abrogated by a statute it does. According deference to that decision would intrude on the core function of the judiciary to make those types of determinations. And I want to begin just by talking a bit about the City of Arlington case, because that is the main case that the other side says should control here. It's important to recall what was at issue in that case. That involved a provision in the Communications Act that required state and local governments to act on wireless sighting applications within a, quote, reasonable period of time after a request had been filed with the FCC. The FCC went ahead and issued regulations as to what would constitute a reasonable period of time. And Justice Scalia's opinion for the Court noted that there was no question that the FCC, that there was preemption of state and local regulations in this area. It was only a question of the scope of the agency's authority. And so he pointed out that talking about this in terms of what is jurisdictional and non-jurisdictional misses the point. The question is simply what Congress authorized the agency to do. So City of Arlington did not involve an issue like this, like the one here, where an agency is interpreting language in a statute it's authorized to administer to override, to effectively declare impliedly repealed a statute it does not administer. I have a point. Roberts. In your view, the letter that I was referring to earlier that sets out the reasoning of the NIGC, is it relying on the implied repeal idea? I think it quite clearly does. I mean, if you look at, so in the letter to the Alabama-Coshawta Tribe itself, that's on the record, in the record at page 1470, in page 74 of their appendix, the NIGC chairman says, comes out and says, we must look to the solicitor's opinion. And then in the other letter itself, that gives a bit more of an explanation, the one that was to the other tribe, the Isla Del Cerre Pueblo tribe, the NIGC chairman says, you know, they sought guidance from the Department of the Interior Solicitor's Office about how to interpret the interface between these two acts, because the NIGC chairman recognizes that the analysis is not simply about IGRA, that the Restoration Act continues to apply to these two tribes. So it has to do something. I mean, when the Restoration Act applies and it has a gaming provision that would apply, something has to happen. So I think that there is language that suggests that the NIGC chairman is effectively relying on the determination that the Restoration Act was impliedly repealed. But I think even in the absence of that language, it's just that would have to be the reality of it. It would be de facto impliedly repealed. To read out a provision that explicitly says that gaming activities are subject or are governed by Texas law no longer applies, and we're going to do this whole Class II thing and just focus on what's in IGRA. I also, we have a difference of opinion, I think, between our two sides over the Santee Sioux case out of the Eighth Circuit. We think it's quite clear when you look at that case that there were two issues there. One was a fairly prosaic look at what the NIGC determined constituted electronic aids and facsimiles in the course of making its decision. Then there was the separate issue of there's this federal law, the Johnson Act, that deals with the importation of certain types of gaming equipment onto federal Indian lands. And the question there was the continued effect of that law, the interplay between that and IGRA. And the Court there made clear, I mean, there's just the structure of the opinion itself, that the language that's talking about deferring to the NIGC's determinations is all about that first issue. I don't remember if it came in that particular order, but it's directed at the interpretation of facsimile and other things where one would expect the agency would have some degree of expertise. The Court, on the other hand, goes through the legal analysis de novo itself to talk about the interplay between IGRA and the Restoration Act. It does not appear at all, does not say, and does not appear at all to be deferring to the agency there, which makes sense because that is an area where we wouldn't expect an agency necessarily to have expertise more so than any court that is much more used to deciding which one of two statutes controls and applying interpretive cans that have nothing to do with an expertise on gaming law. And that accords entirely with the Epic Systems case just from this last term. I mean, they're like here. The agency did not seek to interpret its statute in isolation. The NLRB's construction of the National Labor Relations Act, which is a statute that administers, was in — it interpreted that act in a way that invalidated portions of the arbitration act that it doesn't administer. And it didn't just do this willy-nilly. I mean, this was also grounded in — if you look at 29 U.S.C. 157, that's the provision in the NLRA that it was construing. And this refers to the NLRB's control over things that are considered concerted activities. And so the NLRB determined that arbitration agreements barring class action claims affected — were essentially concerted activities under its regulatory ambit. So it was grounded in a statute that it administers. But the Supreme Court, Justice Gorsuch's opinion said that that doesn't mean that it applies, because the agency sought to interpret the statute, the NLRA, that administers in a way that limits the work of a second statute that it doesn't administer, and held that on no account might we agree that the — that Congress implicitly delegated authority to address the meaning of that second statute, especially in a scenario like — I mean, we cite that case because a lot of these that they talk about, and the American community bankers, where you're making determinations that are to some degree linked to a separate statute. And that is just fundamentally different to say, you know, I have the power to look at a definition in a separate statute or determine — versus essentially saying this entire provision in a separate statute that we have no authority to administer is gone, has been impliedly repealed by the statute that gives us our authority. Roberts. What they say, of course, what the other side says is that the IGRA directs the NIGC to figure out whether a certain kind of gaming has been prohibited by any other — by Federal law, and so we'd necessarily — we have to go look at the Restoration Act and see what it did. That's — what's your response to that? Well, I think that — I mean, we don't dispute that the language in IGRA directs the NIGC chairman to look to other Federal law. We would dispute that that displays Congress's unmistakable intent that any Federal law that the NIGC chairman happens to consider as on point can be held impliedly repealed by the NIGC chairman, and then all courts have to defer to that, especially after — especially when that would — I mean, it would essentially — What if it were — take out the implied repeal stuff. I know you all have a difference of opinion on the basis for the agency action. Take out the implied repeal stuff, and you have the NIGC just looking at the Restoration Act and necessarily interpreting the terms of it to see if it's consistent with the question presented under the IGRA in this case. Different? Now do we defer? Different. I mean, I think that we're not as close to the line, I guess, because there was an implied repeal here, but that is Epic Systems. That is the Santee Suitcase. And so we would hold that still there, there would not be deference to the agency's determination simply because something constitutes a Federal law, and IGRA references generally Federal law. I mean, that is — we also — we talk about the — I mean, this happens routinely all the time. We talk about the BIA cases in our brief where, you know, the Board of Immigration Appeals frequently has to reference other laws. That doesn't mean that the agency all of a sudden can be thought of as having particular expertise it brings to bear with the construction of laws that it does not deal with routinely because it's charged to a different agency and it's not within that agency's area of expertise. One other thing I just want to address very, very briefly about the — I think this is the main difference between this case and the First Circuit cases, is that the First Circuit, first of all, which was not bound by anything like ISLUT01, and also accorded no deference to the NIGC determination there, there was a footnote where they said, we're not addressing this, we're just deciding this matter ourselves. There was no savings clause or anything akin to a savings clause dealing with the Aquina tribe. That was the difference the First Circuit made between it and a main tribe. Here, it's not true that there's nothing like a savings clause. I mean, the tribe relies on this — relies on this language talking about how future benefits and services would be applicable to the Alabama Kshada in the Restoration Act. But as we argue in the brief, this is — there's a separate provision that talks about laws and rules of law. We would argue that IGRA is more appropriately considered a law or rule of law instead of a benefit or service, like loan guarantees or whatever else you get from Federal Restoration. And that clause, Section 203a of the Restoration Act, provides that all laws and rules of laws of general application, which are not inconsistent with any specific provisions of this Act, will apply to the tribe going forward. If there are no questions. All right. Thank you, Mr. White. Mr. Ashby, you've saved time for rebuttal. Thank you, Your Honors. With respect to the State's argument that there's somehow a savings clause in the Restoration Act, there's not. Section 203a does not operate prospectively to preclude application of any later enacted law inconsistent with the Restoration Act. It says nothing about prohibiting Indian gaming or preserving State or Federal law against a later enacted Federal law. And because IGRA was not enacted until 14 months later, it could not have been an inconsistent law displaced by the Restoration Act. Congress always adopts savings clauses in clear and unambiguous terms. As in the Maine Settlement Act, which barred application of future Federal laws in Maine unless the Federal law expressly was made applicable in Maine. The fact that the savings clause in the Maine Settlement Act had already been on the books for seven years before the Restoration Act was enacted confirms that Congress did not intend the Restoration Act to contain such a savings clause. Congress knows how to address those clauses. It didn't do so here. And the argument that benefits doesn't mean laws, of course all those benefits and services come from Federal laws. And the only way tribes get additional Federal benefits and services is through additional Federal laws. And that's the whole point of IGRA. Fourteen months after the Restoration Act, Congress adopted this law in order to benefit Tribal government, Tribal self-determination, Tribal economic development. That was Congress's intent in enacting this law. The issue here is, is the Restoration Act sufficiently specific to prohibit Class II gaming? And if you look at the language of the Restoration Act, all it says is all gaming prohibited by the State of Texas is prohibited on the tribe's lands. Bingo is not prohibited by the State of Texas. It's not prohibited now, and it was not prohibited at the time that IGRA was adopted. So what the State is really arguing is because they regulate bingo, that somehow that results in a prohibition and somehow makes this law sufficiently specific to exclude the tribe from Class II gaming under IGRA. We submit that at a minimum, the NIGC's contrary interpretation is at least reasonable. The plain language of the Restoration Act uses the word prohibit. And it would be very odd, indeed, to have the NIGC come to the conclusion that even though Texas doesn't prohibit bingo, somehow the Restoration Act is sufficiently specific as to preclude the application or to preclude the tribe's ability to engage in Class II gaming. With respect to implied repeal, again, the NIGC found only that the gaming prohibition in the Restoration Act wasn't sufficiently specific to remove the tribe from IGRA's scope or the NIGC's jurisdiction for purposes of Class II gaming, which, again, Congress expressly authorized it to do. Obviously, there are all kinds of ranges of Chevron deference, where at the edges, if you're talking about implied delegation or I think Justice Gorsuch wrote an opinion a few months ago saying it's clear enough that that was Congress's intent, we're not going to give Chevron deference. But none of those issues are even remotely an issue here. This is garden variety, run-of-the-mill Chevron deference because Congress expressly delegated this decision-making authority to the NIGC, and the NIGC clearly has the subject matter expertise to address these issues, even as it relates to the Restoration Act, because it's only looking at the gaming provision. And it is true that the NIGC asked the Department of Interior Solicitor General's office to look at issues, but that's only because the Department of Interior has to make certain determinations under the law that it administers. And those have to do with whether the tribe possesses sufficient jurisdiction to be entitled to engage in gaming. To the extent the Solicitor General went further and found implied repeal, that's not adopted at all by the NIGC chairman. The letter only notes that the Department of Interior concurred with the NIGC's decision and also separately concluded that there was implied repeal. But the two statutes here can coexist in harmony. To the extent the tribe is not engaged in Class 2 gaming pursuant to the Class 2 safe harbor in Niagara, it continues to be subject to the Restoration Act and subject to the state's ability to seek conjunctive relief. Thank you, Your Honor. Thank you, Mr. Ashby. Your case is under submission. The Court will take a brief recess before hearing the final two cases.